## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GOVERNMENT EMPLOYEES' RETIREMENT
SYSTEM OF THE VIRGIN ISLANDS, on behalf
of itself and all others similarly situated,

Plaintiff,

v.

BANCO SANTANDER S.A., SANTANDER
INVESTMENT SECURITIES, INC.,
SANTANDER HOLDINGS USA, INC., BANCO
SANTANDER (MEXICO) S.A. INSTITUCIÓN
DE BANCA MÚLTIPLE, GRUPO
FINANCIERO, SANTANDER INVESTMENT
BOLSA, SOCIEDAD DE VALORES, S.A.U.,
BANCO BILBAO VIZCAYA ARGENTARIA,
S.A., BBVA SECURITIES, INC., BBVA
COMPASS BANCSHARES, INC., BBVA
BANCOMER S.A., INSTITUCION DE BANCA
MULTIPLE, GRUPO FINANCIERO BBVA
BANCOMER, GRUPO FINANCIERO BBVA
BANCOMER, S.A. DE C.V., JPMORGAN
CHASE & CO., JPMORGAN CHASE BANK,
NATIONAL ASSOCIATION, J.P. MORGAN
SECURITIES LLC, J.P. MORGAN BROKER-
DEALER HOLDINGS INC., BANCO J.P.
MORGAN, S.A. INSTITUCIÓN DE BANCA
MÚLTIPLE, J.P. MORGAN GRUPO
FINANCIERO, HSBC HOLDINGS PLC, HSBC
BANK PLC, HSBC SECURITIES (USA) INC.,
HSBC MARKETS (USA) INC., HSBC MÉXICO,
S.A., INSTITUCION DE BANCA MÚLTIPLE,
GRUPO FINANCIERO HSBC, HSBC NORTH
AMERICA HOLDINGS INC., HSBC LATIN
AMERICA HOLDINGS (UK) LIMITED,
BARCLAYS PLC, BARCLAYS

Case No.

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

CAPITAL PLC, BARCLAYS CAPITAL INC.,
BARCLAYS BANK PLC, GRUPO
FINANCIERO BARCLAYS MEXICO, S.A. DE
C.V., BARCLAYS BANK MEXICO, S.A.,
CITIGROUP INC., CITIGROUP GLOBAL
MARKETS INC., CITIGROUP FINANCIAL
PRODUCTS INC., CITIGROUP GLOBAL
MARKETS HOLDINGS INC., BANCO
NACIONAL DE MEXICO, S.A., INSTITUCION
DE BANCA MULTIPLE, GRUPO
FINANCIERO BANAMEX, BANK OF
AMERICA N.A., BANK OF AMERICA
CORPORATION, BANKAMERICA
INTERNATIONAL FINANCIAL
CORPORATION, BANK OF AMERICA
MEXICO, S.A., INSTITUCIÓN DE BANCA
MÚLTIPLE, GRUPO FINANCIERO BANK OF
AMERICA, MERRILL LYNCH, PIERCE,
FENNER & SMITH INCORPORATED,
DEUTSCHE BANK AG, DEUTSCHE BANK
SECURITIES, INC., DEUTSCHE BANK
MÉXICO, S.A. INSTITUCIÓN DE BANCA
MÚLTIPLE, CREDIT SUISSE AG, CREDIT
SUISSE (USA) INC., CREDIT SUISSE AG,
NEW YORK BRANCH, CREDIT SUISSE
SECURITIES (USA) LLC, GRUPO
FINANCIERO CREDIT SUISSE (MEXICO),
S.A. DE C.V., BANCO DE CREDIT SUISSE
(MEXICO), CASA DE BOLSA CREDIT
SUISSE (MEXICO), S.A. DE C.V., CREDIT
SUISSE SERVICIOS (MEXICO) S.A. DE C.V.,
AND "JOHN DOES" 1-10

Defendants.

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION .................................................................................1

II.   PARTIES ...........................................................................................................3

      A.    Plaintiff ...................................................................................................3

      B.    The Banco Santander Defendants ..........................................................4

      C.    The BBVA Defendants ...........................................................................5

      D.    The JPMC Defendants ............................................................................6

      E.    The HSBC Defendants ............................................................................7

      F.    The Barclays Defendants ........................................................................7

      G.    The Citigroup Defendants .......................................................................8

      H.    The Bank of America Defendants...........................................................9

      I.    The Deutsche Bank Defendants ............................................................10

      J.    The Credit Suisse Defendants ...............................................................10

III.  JURISDICTION AND VENUE .......................................................................11

IV.   CLASS ACTION ALLEGATIONS .................................................................12

V.    MGB AUCTIONS AND MARKET MAKERS ...............................................14

VI.   DEFENDANTS' ROLE AS MARKET MAKERS...........................................18

VII.  DEFENDANTS FIX THE BID-ASK SPREAD................................................20

VIII. DEFENDANTS' HISTORY OF FIXING FINANCIAL INSTRUMENTS ....................21

IX.   EMPIRICAL EVIDENCE OF MANIPULATION ..........................................24

      A.    Price Dispersion in BONDES D Auctions Has Doubled........................ 24

      B.    Bid-Ask Spread In BONOS Narrows Since April 19, 2017....................26

X.    FRAUDULENT CONCEALMENT....................................................................27

XI.   CLAIM FOR RELIEF ......................................................................................28

      VIOLATION OF THE SHERMAN ACT ........................................................28

XII.    DEMAND FOR JUDGMENT ............................................................................................ 29

XIII.   JURY DEMAND ........................................................................................................... 30

Plaintiff Government Employees' Retirement System of the Virgin Islands ("Plaintiff" or "GERS") alleges upon information and belief the following:

## I.    NATURE OF THE ACTION

1.    This action follows in a string of other investigations and actions in which the world's largest banks conspired with one another to manipulate key financial rates, metrics and instruments to benefit themselves and to the detriment of their clients. Plaintiff GERS, a public pension system that provides retirement, disability, and other benefits to officials and employees of the government of the Virgin Islands, has been victimized by the deliberate manipulation of pricing on Mexican Government Bonds, and this action seeks to recover on its behalf and on behalf of a class of direct purchasers of such bonds from the defendants named in this Complaint.

2.    Government bonds, also called sovereign bonds, are issued by national governments to finance public projects. They are usually structured with a promise to pay periodic interest payments and to repay the face value on the maturity date in the denominated currency. The terms upon which a government can sell bonds depend on how creditworthy the market considers it to be. International credit rating agencies will provide ratings for the bonds, but market participants determine pricing, factoring creditworthiness into their pricing.

3.    Competition is the cornerstone to building fair and efficient markets for government-issued debt offerings such as bonds: "an efficient government securities market is characterized by a competitive market structure, low transaction costs, low levels of fragmentation, a safe and robust infrastructure, and a high level of heterogeneity among participants."[1] The reason that competition is particularly important to bond markets is intuitive: if the brokers and intermediaries that are selling bonds to investors compete against one another, the prices that investors pay for bonds will be fair

---

[1] IBRD / World Bank, International Monetary Fund. Developing Government Bond Markets a Handbook. 2001, p.4.

and reflect the natural interplay of market dynamics. In this way, both those engaged in the marketplace and the governments issuing the bonds benefit.

4.    Market makers in a specific market quote both a buy and a sell price in a financial instrument or commodity held in inventory, hoping to make a profit on the bid-offer spread ("Market Makers"). The defendants in this case—designated Market Makers in government bonds issues by the Federal Government of Mexico ("MGB")—have subverted competition in the market for MGBs.[2] Rather than provide a robust competitive market, Defendants have engaged in a longstanding scheme to fix or rig the bid-ask spread for primary and secondary MGB offerings.

5.    Defendants carried out this scheme by exchanging competitively sensitive information, such as their order flow and prices at which they intended to purchase or sell MGB, and by coordinating their buying and selling activity in MGBs. Such actions violated the rules of the sale process, pursuant to which bids were to be submitted blind.

6.    As a result of Defendants' actions, Plaintiff and other purchasers of MGBs have been harmed by purchasing into a market where prices and yields are set not by the intersection of supply and demand, but by secret agreements between Defendants to fix or set the prices at which MGBs are sold and the yields that they offer.

7.    Defendants, some of the world's largest financial institutions, are horizontal competitors in the market for auctions for MGBs—in which only Market Makers may participate— and in the resale market for MGBs. Rather than compete against one another for the prices at which they bought or sold MGBs, they coordinated to ensure that Mexico received lower than competitive prices, and Plaintiff paid supracompetitive prices, for MGBs. The Defendant Market Makers abused their positions as participants in a market program that is offered by Mexico's Secretaría

---

[2] Defendants are defined at Paragraphs 11-40, infra.

de Hacienda y Crédito Público (the Mexican Finance Ministry ("MFN")). The MFN designated Defendants as Market Makers in order to create a vibrant market for MGBs where competition would allow in fair prices. Instead, the opposite occurred.

8.     Defendants' activities are the subject of multiple investigations by Mexican regulatory authorities. Mexico's Comisión Federal de Competencia Económica ("COFECE"), Mexico's antitrust authority, announced in April 2017 that it has been investigating anticompetitive activity in MGBs since October 2016. Carlos Mena Labarthe, heads of COFECE's investigation, said that Mexico places billions of pesos in debt securities on the market each year and that trading volume for the bonds can reach 100 billion pesos ($5.3 billion) per day. In May 2017, it was reported that COFECE was working with a leniency applicant that had admitted to certain agreements. It has also been reported that the Mexican Finance Ministry is also conducting an investigation.

9.     In addition to the COFECE investigation, the Mexican regulatory agency responsible for the enforcement of its securities laws, the Comisión Nacional Bancaria y de Valores ("CNBV") is conducting its own investigation, initiated months after COFECE's. Finally, the Mexican Finance Industry itself is conducting an investigation.

## II.    PARTIES

### A.    Plaintiff

10.     GERS is a pension system with over $1 billion in assets under management for the benefit of more than 9,300 active members and more than 8,700 retirees and pensioners. GERS purchased tens of millions of dollars of MGBs from Defendants throughout the Class Period.

B.     **The Banco Santander Defendants**

11.     Defendant Banco Santander S.A., once known as Banco Santander Central Hispano S.A., is a public banking group with its global headquarters in Santander, Spain. Santander Bank, Banco Santander Puerto Rico, Santander Consumer USA, Banco Santander International, Santander Investment Securities, and Banco Santander S.A. New York Branch ("Santander New York") are affiliates of Defendant Banco Santander S.A., and are subsidiaries of its Intermediate Holding Company ("IHC"). Defendant Santander Holdings USA, Inc., is a direct, wholly-owned subsidiary of Banco Santander S.A. Defendant Santander Investment Securities, Inc. ("Santander Securities") is a wholly-owned subsidiary of Santander Holdings USA, Inc. Santander Securities has its headquarters in New York City, New York, is a member of FINRA, and Banco Santander S.A. operates in Mexico through Defendant Banco Santander (Mexico) S.A. Institución de Banca Multiple, Grupo Financiero ("Santander Mexico"). Santander Mexico is the successor to Grupo Financiero Santander Mexico, S.A.B. de C.V. Santander Mexico worked with Santander Securities to market and sell MGB to investors in the United States during the Class Period, and Santander Securities issued analyst reports covering MGBs that had input from Santander Mexico personnel. Together they are the "Banco Santander Defendants."

12.     The Banco Santander Defendants' United States operations are extensive. In 2016, Banco Santander S.A. derived more than $370 million in profit from its U.S. operations, which includes trading activity in MGBs. Santander New York reported $1.4 billion in assets in its 2015 U.S. Resolution Plan.

13.     The Banco Santander Defendants transacted in MGBs in the United States during the Class Period, and class members transacted MGBs directly with the Santander Defendants in New York during the Class Period.

14.     The MFN designated the Banco Santander Defendants as a designated market maker for MGBs throughout the Class Period and is presently under investigation by Mexican authorities for participating in anticompetitive activity in the market for MGBs.

**C.     The BBVA Defendants**

15.     Defendant Banco Bilbao Vizcaya Argentaria, S.A. ("BBVA S.A.") is an international financial group with its headquarters in Bilbao, Spain. Grupo Financiero BBVA Bancomer, S.A. de C.V. ("GF BBVA"), BBVA Compass Bancshares, Inc., and BBVA Securities, Inc., are wholly-owned subsidiaries of BBVA S.A. BBVA Bancomer S.A., Institucion de Banca Multiple, Grupo Financiero BBVA Bancomer ("BBVA-Bancomer") is a wholly-owned subsidiary of BBVA S.A. and is the principal direct subsidiary of GF BBVA. It is based in Mexico City, Mexico. Defendants BBVA S.A., BBVA Compass Bancshares, Inc., BBVA Securities, Inc., Grupo Financiero BBVA Bancomer, S.A. de C.V., and BBVA-Bancomer are collectively referred to as the "BBVA Defendants."

16.     The BBVA Defendants provide diversified financial services in the United States, including extensive trading in fixed income instruments such as MGBs. In 2016, BBVA S.A. reported over 2.9 billion euros in gross profit in the United States for 2017, and over 2.7 billion euros in 2017. The BBVA Defendants make 40% of their profits from Mexico and its net profits for 2016 was 4.6 billion euros.[3]

17.     The BBVA Defendants transacted in MGBs in the United States during the Class Period, and class members transacted directly with BBVA in the United States during the Class Period.

---

[3] *Financial Times*, "Latin America operations drive profits at BBVA," Feb. 1, 2018, https://www.ft.com/content/47e2e6b0-072f-11e8-9650-9c0ad2d7c5b5

5

18.     The MFN designated the BBVA Defendants as a designated market maker for MGBs throughout the Class Period. The BBVA Defendants are presently under investigation by Mexican authorities for participating in anticompetitive activity in the market for MGBs.

**D.     The JPMC Defendants**

19.     Defendant JPMorgan Chase & Co. ("JPMC") is an American banking and financial services holding company headquartered in New York, New York. Defendant J.P. Morgan Broker-Dealer Holdings Inc. ("JPMH") is a direct, wholly-owned subsidiary of JPMC and is based in New York. Defendant JP Morgan Securities LLC ("JPMCS") is based in New York and is a wholly-owned subsidiary of JPMC and a direct subsidiary of J.P. Morgan Broker-Dealer Holdings Inc. Banco J.P. Morgan S.A. and J.P. Morgan Grupo Financiero (together, "JPMEX") are wholly-owned subsidiaries of JPMC located in Mexico. Defendant JPMorgan Chase Bank, National Association ("JPMCNA") is a wholly-owned subsidiary of JPMC, which is headquartered in New York. JPMCNA marketed MGBs to and transacted MGBs with investors throughout the United States during the Class Period. JPMC, JPMH, JPMCS, and JPMCNA are the "JPMC Defendants."

20.     The JPMC Defendants transacted in MGBs in the United States during the Class Period, and class members transacted directly with the JPMC Defendants in the United States during the Class Period.

21.     JPMC has reported that it had $1.4 billion in trading and investing assets within Mexico in 2016, including trades and investments in MGBs.

22.     The MFN designated the JPMC Defendants, including its predecessor in interest Chase Manhattan Bank, as a designated market maker in MGBs during the Class Period. The JPMC Defendants are presently under investigation by Mexican authorities for participating in anticompetitive activity in the market for MGBs.

### E.     The HSBC Defendants

23.     Defendant HSBC Holdings PLC is a British banking and financial services company headquartered in London, England. Defendant HSBC Bank PLC is a wholly-owned subsidiary of HSBC Holdings. Defendant HSBC Mexico, S.A., Institucion De Banca Múltiple, Grupo Financiero HSBC ("HSBC Mexico") is a direct subsidiary of Defendant HSBC Latin America Holdings (UK) Limited and a wholly-owned subsidiary of Defendant HSBC Holdings PLC. HSBC Securities USA) Inc. is a wholly-owned subsidiary of HSBC Holdings PLC, and it operates in the United States through its subsidiaries HSBC Markets (USA) Inc. and HSBC North America Holdings Inc. Collectively they are the "HSBC Defendants."

24.     The HSBC Defendants transacted in MGBs in the United States during the Class Period, and class members transacted directly with HSBC in the United States during the Class Period.

25.     The MFN designated the HSBC Defendants as a designated market maker in MGBs during the Class Period. The HSBC Defendants are presently under investigation by Mexican authorities for participating in anticompetitive activity in the market for MGBs.

### F.     The Barclays Defendants

26.     Defendant Barclays PLC is a banking and financial services company headquartered in London, England. Defendant Barclay Capital Inc. is a wholly-owned subsidiary of Barclays PLC that is incorporated under the laws of Connecticut and has its headquarters in New York City, New York. Defendant Barclays Bank PLC is a wholly-owned subsidiary of Barclays PLC, and operates their banking and financial services in the United States through its own subsidiary, Defendant Barclays Capital PLC. Barclays Capital PLC does business under the name "Barclays Investment Bank" and has offices throughout the United States that sell fixed income products, including MGBs, to U.S. investors. Defendant Barclays Bank Mexico, S.A.

7

("Barclays Mexico") is a wholly-owned subsidiary of Defendant Grupo Financiero Barclays Mexico, S.A. de C.V. Barclays Mexico is located in Mexico City, Mexico. Together they are the "Barclays Defendants."

27.    The Barclays Defendants transacted in MGBs in the United States during the Class Period, and class members transacted directly with the Barclays Defendants in the United States during the Class Period.

28.    The MFN designated Barclays Mexico of the Barclays Defendants as a designated market maker in MGBs during the Class Period. The Barclays Defendants are presently under investigation by Mexican authorities for participating in anticompetitive activity in the market for MGBs.

### G.    The Citigroup Defendants

29.    Defendant Citigroup Inc. is an investment banking and financial services corporation headquartered in New York City, New York. Defendant Citigroup Global Markets Holdings Inc. ("CGMH") is a direct subsidiary of Citigroup Inc. and is based in New York. Defendant Citigroup Financial Products Inc. ("CGFP") is a wholly-owned subsidiary of CGMH also located in New York City, New York. Defendant Citigroup Global Markets Inc. ("CGMI") is a subsidiary of CGFP also located in New York City, New York. CGMI markets and sells fixed income products such as MGBs to investors in the United States. Banco Nacional de Mexico, S.A., Institucion de Banca Multiple, Grupo Financiero Banamex ("Citibanamex") is a wholly-owned subsidiary of Citigroup Inc. located in Mexico. Citigroup Inc., CGMH, CGFP, and Citibanamex are the "Citigroup Defendants."

30.    The Citigroup Defendants transacted in MGBs in the United States during the Class Period, and class members transacted directly with BBVA in the United States during the Class Period.

31.    The MFN designated Citbanamex of the Citigroup Defendants as a designated market maker in MGBs during the Class Period. The Citigroup Defendants are presently under investigation by Mexican authorities for participating in anticompetitive activity in the market for MGBs.

**H.    The Bank of America Defendants**

32.    Defendant Bank of America Corporation is a banking and financial services corporation headquartered in Charlotte, North Carolina. Defendant Bank of America N.A. is a wholly-owned subsidiary of Bank of America Corporation that sells fixed income products such as MGBs to investors in the United States, including from its offices in New York City, New York. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a wholly-owned subsidiary of Bank of America Corporation based in New York City, New York. It is the successor to Banc of America Securities, which traded MGBs in the United States. Defendant Bank of America Mexico, S.A., Institucion de Banca Multiple, Grupo Financiero Bank of America ("Bank of America Mexico") is a wholly-owned subsidiary of Bank of America Corporation located in Mexico. Defendant Bank of America International Financial Corporation is a wholly-owned subsidiary of Bank of America N.A., and the corporate parent of Bank of America Mexico. Together they are the "Bank of America Defendants."

33.    The Bank of America Defendants transacted in MGBs in the United States during the Class Period, and class members transacted directly with the Bank of America Defendants in the United States during the Class Period.

34.    The MFN designated Bank of America Mexico of Bank of America Defendants as a designated market maker in MGBs during the Class Period. The Bank of America Defendants are presently under investigation by Mexican authorities for participating in anticompetitive activity in the market for MGBs.

9

## I.    The Deutsche Bank Defendants

35.    Defendant Deutsche Bank AG is a banking and financial services company headquartered in Frankfurt, Germany. Deutsche Bank AG conducts substantial business in the United States, often through its United States headquarters in New York City, New York. Deutsche Bank Securities Inc. ("DBSI") is a registered broker-dealer and financial services company headquartered in New York City, New York. Deutsche Bank Mexico, S.A. Institucion de Banca Multiple is a wholly owned subsidiary of Deutsche Bank AG located in Mexico ("DB Mexico"). Deutsche Bank AG, DBSI, and DB Mexico are the Deutsche Bank Defendants.

36.    The Deutsche Bank Defendants transacted in MGBs in the United States during the Class Period, and class members transacted directly with the Deutsche Bank Defendants in the United States during the Class Period.

37.    The MFN designated the Deutsche Bank Defendants as a designated market maker in MGBs during the Class Period. The Deutsche Bank Defendants are presently under investigation by Mexican authorities for participating in anticompetitive activity in the market for MGBs. It has been reported that Deutsche Bank may be the rumored leniency applicant with COFECE.

## J.    The Credit Suisse Defendants

38.    Defendant Credit Suisse AG is a banking and financial services company headquartered in Zurich, Switzerland. Defendant Credit Suisse AG, New York Branch is a subsidiary of Credit Suisse AG. Defendants Credit Suisse (USA) Inc. and Credit Suisse Holding (USA) Inc. are subsidiaries of Credit Suisse AG with their headquarters in New York City, New York. Defendants Credit Suisse Financiero Credit Suisse (Mexico), S.A. de C.V., Banco Credit Suisse (Mexico), Casa de Bolsa Credit Suisse (Mexico), and S.A. de C.V., Credit Suisse Servicios (Mexico) are subsidiaries of Credit Suisse it AG it calls its "Financial Group" for Mexican

operations. Defendant Grupo Financiero Credit Suisse (Mexico), S.A. de C.V., is a holding company created by Credit Suisse AG to hold its assets in Mexico and operate its Financial Group. The Financial Group was created "to allow Credit Suisse to capitalize on the growing opportunities available in the local market while expanding Credit Suisse's existing business in the country. With the establishment of the Financial Group, Credit Suisse will initially concentrate on a range of products including foreign exchange and securities trading via the Bank, and debt underwriting through the broker-dealer."[4] Together they are the "Credit Suisse Defendants."

39.    The Credit Suisse Defendants transacted in MGBs in the United States during the Class Period, and class members transacted directly with the Credit Suisse Defendants in the United States during the Class Period

40.    The MFN designated the Credit Suisse Defendants as a designated market maker in MGBs during the Class Period. The Credit Suisse Defendants are presently under investigation by Mexican authorities for participating in anticompetitive activity in the market for MGBs.

41.    Collectively, the parties referred to in Paragraphs 11 through 40 above are referred to herein as "Defendants."

## III. JURISDICTION AND VENUE

42.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a). Jurisdiction can be found over the state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy. Jurisdiction exists under

---

[4] Credit Suisse Financial and Regulatory Release, "Credit Suisse Mexico," https://www.credit-suisse.com/us/en/investment-banking/financial regulatory/mexico-financials.html

28 U.S.C. §1332 because the amount in controversy exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

43.    Venue is proper in this District pursuant to, among other statutes, §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22, and 26, and 28 U.S.C. § 1391. As explained in detail below, a substantial part of the wrongdoing occurred in this District, as one or more Defendants maintained offices in this District and supervised and participated in the wrongdoing from its offices in or around New York City.

44.    Defendants' illegal actions impacted interstate commerce in the United States because Defendants transacted in MGBs with counterparties (including Class members) by telephone, through computers and internet connections, and other electronic means, in the United States, where billions of dollars of MGBs were purchased during the Class Period.

## IV.    CLASS ACTION ALLEGATIONS

45.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and as representatives of the following Class:

> All persons that purchased or sold MGBs directly from or to Defendants in the United States (including its territories and the District of Columbia) between at least January 1, 2006 to April 18, 2017 (the "Class Period").

46.    Excluded from the Class are Defendants and their employees, agents, affiliates, parents, subsidiaries and co-conspirators, whether or not named in this Complaint, and the United States government.

47.    Numerosity: there are thousands of Class members who like Plaintiff transacted directly with Defendants. Joinder of such persons is impractical.

48.     Typicality: Plaintiff's claims are typical of other members of the Class, who like Plaintiff transacted directly with Defendants at prices that were fixed due to their collusion. On information and belief, there were substantial sales of MGB in the United States to institutional investors such as Plaintiff during the Class Period.

49.     Adequacy: Plaintiff will fairly protect the interests of Class members. Plaintiff has retained experienced counsel with expertise in antitrust and securities litigation that are capable of vigorously prosecuting its claims and protecting the interests of the Class.

50.     Commonality: There are many common issues of law and fact raised by Plaintiff's allegations. Such issues include

A.  Whether Defendants conspired and agreed to fix the bid-ask spread in MGB auctions and in secondary markets and the nature, frequency, and character of acts in furtherance of the same;

B.  Whether Defendants shared competitively sensitive information such as price and quantity to be purchased from MGB auctions and prices to be offered on the secondary market, and the nature, frequency, and character of acts in furtherance of the same;

C.  Whether Defendants sold MGBs at supracompetitive prices and purchased MGBs at suppressed prices during the Class Period;

D.  Whether Plaintiff and members of the Class suffered damages by purchasing MGBs at inflated prices and selling it at suppressed prices;

E.  Whether Defendants fraudulently concealed their conduct; and

F.  Whether Defendants' acts taken in furtherance of the conspiracy violate Section 1 of the Sherman Act.

51.     A class action is the superior method to resolve the issue raised by Plaintiff and the members of the Class. Class resolution will reduce the risk of conflicting results and duplicative

litigation, and will streamline resolution of the issues raised herein. Prosecution of claims by individual Class members is inefficient and inconsistent with the interests of judicial economy.

## V.    MGB AUCTIONS AND MARKET MAKERS

52.    Mexico issues MGBs through Banco de México ("Banxico") in order to raise capital for infrastructure improvements, fund ongoing government operations, and manage budget deficits. The MFN is "fully responsible for managing the federal debt [of Mexico], with [Banxico] acting as its financial agent or broker."

53.    MGBs have features that are common to other types of bonds. They possess face or par values that represent the amount to be paid to holders on maturity, a pre-determined date when payment is to be made. MGBs may also have coupon payments, which are interest rates paid on the par value. A bond's yield is the annual rate of return on the bond if it is held until maturity. The intervals by which coupon payments are to be made is called the "coupon period." Coupon bonds pay interest on the coupon period, and also face value at maturity. Zero- coupon bonds are issued at a discount to its face value and pay no interest until maturity. The difference between the purchase price and the face value of the bond represents the yield earned by the holder.

54.    The MGBs currently known to have been manipulated include Federal Treasury Certificates (Certificados de la Tesorería de la Federación) ("CETES"); Federal Government Development Bonds (Bonos de Desarrollo del Gobierno Federal) ("BONDES D"); fixed-rate Federal Government Development Bonds (Bonos de Desarrollo del Gobierno Federal con Tasa de Interés Fija) ("BONOS"); and Federal Government Development Bonds denominated in Investment Units (Bonos de Desarrollo del Gobierno Federal denominados en Unidades de Inversión) ("UNIBONOS"). Each is discussed below.

55.     CETES are zero-coupon bonds. They are discount traded (below their nominal value), pay no interest, and are settled at nominal value at maturity date. Currently, their maximum term is one year, although previously they were issued for up to two years. CETES are fungible among themselves as long as they mature on the same date, regardless of their issue date.

56.     CETES have maximum maturities of one-year and are issued with maturities between 28, 91, 182, and 364 days. CETES have a par value of 10 pesos and are normally quoted by their yield rate.

57.     According to BBVA's Handbook of Mexican Financial Instruments ("BBVA Handbook"), CETES "are one of the leading instruments in the Mexican money market and are commonly used as a benchmark for financial transactions. Since 1978, CETES have been the main source of federal government funding."

58.     BONDES are floating-rate government securities, *i.e.,* they pay interest and their rate is revised periodically (the terms at which the rate is periodically revised have changed along their history). BONDES D have a par value of 100 pesos and pay monthly interest in pesos every 28 days. Currently, these bonds are traded at 3-, 5- and 7-year terms. The interest rate paid by these securities is determined by compounding on a daily basis the rate at which banks and brokerage firms carry out their overnight trades and repo transactions with banking instruments. BONDES D are fungible among themselves as long as they mature on the same date, regardless of their issue date.

59.     BONOS are issued and placed at 3, 5, 10, 20 and 30 years. BONOS pay interest every six months and, contrary to BONDES D, their interest rate is determined on the issue date and remains fixed all along their term. BONOS are fungible if they pay the exact same interest rate. BONOS are susceptible to being stripped, *i.e.,* the principal's interest payment may be segregated

15

in "stripped coupons" and, even when already stripped, they may be reconstituted by integrating again the "stripped coupons," the accrued interest, and the corresponding principal, therefore returning it to the initial issue format.

60.     UDIBONOS are issued and placed at 3, 10 and 30 years and pay interest every six months at a real fixed interest rate determined at their issue date. They pay interest in Mexican pesos. UDIBONOS are fungible among themselves if they pay the exact same interest rate. UDIBONOS are inflation-hedged instruments, and are susceptible to being stripped (the principal's interest payment may be segregated in "stripped coupons"). Like BONOS, they may be reconstituted by integrating again the "stripped coupons," the accrued interest, and the corresponding principal. UDIBONOS have a par value of 100 "UDIs," which are inflation investment units tied to Mexico's National Consumer Price Index.

61.     Banxico uses Defendants as the exclusive agents to sell MGBs through actions: "Market makers in Mexico are credit institutions and brokerage firms—appointed by the Ministry of Finance—conferred with the obligation of participating very actively in the fixed-rate government securities market. These institutions must present bids at competitive prices in each primary auction of securities, and must also permanently quote purchase (bid) and sale (offer) prices in the secondary market in order to provide liquidity and facilitate investment in this market."

62.     Defendants sell MGBs in weekly auctions. Ordinary investors, including GERS, cannot directly participate in these auctions. The bidding process by which Defendants submit bids to Banxico is supposed to be blind. Defendants are to simultaneously submit bids indicating the amount of MGBs they are willing to purchase and the price that are sealed or encrypted to ensure

the terms are confidential. The BBVA Handbook states that bids are submitted "either in a sealed envelope or through encrypted electronic file."

63.     CETES and BONDES D are issued in "multi-price" auctions. According to Banxico, in multi-price auctions "the winning bids are allotted at the price offered by each bidder. The advantages of this type of auctions include maximizing the profit to be received by the issuer by obtaining the maximum price each bidder is willing to pay. The main disadvantage of this type of auctions for issuers, however, is that the incentives for bidders to collude are higher."

64.     BONOS and UDIBONOS are sold via single price auctions. According to Banxico, in single price auctions "All winning bids are allotted at the corresponding price of the last bid assigned. In the end, the price paid by the bidder may be lower than the price he is willing to pay, which represents a disadvantage for the issuer. An advantage of single price auctions for issuers is that the incentives for bidders to collude are lower."

65.     As demonstrated in the chart below, foreign investors have held the majority of outstanding Mexican bonds since 2013:



66.     It has been noted that for some MGBs "[t]he majority of the bonds were sold to US institutional investors."

67.     Defendants have made substantial efforts to market MGB to customers in the United States. For example, BBVA has touted MGBs: "The expected total return of the 10 year Mexican Government Bond is higher relative to those of other countries' given its higher yield and the appreciation of the currency expected by the market." BBVA considers itself a "leading franchise in the Mexican market."

## VI.     DEFENDANTS' ROLE AS MARKET MAKERS

68.     Currently there are eight Market Makers in MGB, including Banamex, Bank of America, Barclays, BBVA, Deutsche Bank, JP Morgan, HSBC, and Santander. Citibank, Credit Suisse, ING, and Merrill Lynch were formerly Market Makers during the Class Period.

69.     These financial institutions accept positions as Market Makers because they can sell MGBs and profit from the difference between the bid-ask spread, which is the difference

18

between the price they purchase and sell MGBs outside the auction to consumers such as Plaintiff. Moreover, Market Makers enjoy certain privileges from Banxico including "(1) additional purchase of securities by exercising an option for the amount originally placed in the weekly primary auction; (2) access to securities lending through the central bank facility and (3) exclusive participation in syndicated placements."

70.     However, the Market Makers for MGB are regulated by certain specific requirements that establish their roles and duties in both primary and secondary markets. For example, according to Banxico, in auctions Defendants are required "to obtain the best possible financing conditions for the Federal Government." They are also required to keep bid and offer quotes at all times for securities in which they are Market Makers.

71.     To conduct the auctions, Market Makers must present a minimum amount of bids in each primary auction. This minimum amount is the lower of either (1) 20% of the amount offered by the Federal Government, or (2) 1 divided by the number of market markers in the bond. For example, if there were four Market Makers, each would be required to bid at least 20%, and if there were eight Market Markers each would be required to bid at least 12.5%.

72.     In secondary markets, Banxico requires that Market Makers "present quotes (both for bid and offer) for each of the securities they are market makers of, in all their maturities. Quotes are presented through brokers systems, for interbank trading, and trading with the clientele. Market makers are expected to comply with healthy practices and establish trading mechanisms to carry out transactions among each other." To accomplish the transactions, Market Makers sell MGB electronically and telephonically to purchasers in the United States such as Plaintiff.

73.    Defendants dominate the secondary market for MGB. According to Banxico, "In terms of instruments, market makers stand out in transactions with bonos, as they participate in more than 70% of the interbank trading through any channel."

74.    As depicted in the chart below, Defendants' "interbanking" activities comprise a substantial amount of the trading in MGBs.



VII.    DEFENDANTS FIX THE BID-ASK SPREAD

75.    Through their United States-based subsidiaries, Defendants bought and sold MGBs at fixed, artificial bid-ask spreads to investors located in the United States, including in transactions with Plaintiff. Defendants' corporate parents managed and directed their subsidiaries' participation

in the scheme, and marketed and sold MGBs to Class Members in the United States through Defendants' U.S.-based offices. Pension funds such as GERS were targeted by Defendants.

76.     On April 19, 2017, COFECE announced that it was investigating price-fixing in the market for MGBs, and that the anticompetitive activity "could be grave." COFECE said it had found evidence that Defendants agreed to manipulate prices, restrict or limit supply or demand, and allocate the MGB market. "This commission had knowledge of situations that constitute signs of possible antitrust practices," COFECE said. "If there are agreements that affect the auction of government securities, the damage to the public treasury and to investors would be serious," said COFECE's then-Chief Prosecutor Carlos Mena.

77.     According to a July 2017, article in the publication *Plano Informativo*, "The mechanism … is relatively simple. The primary traders submit offers for the bonds in auctions and, through the exchange of information between the operators, manipulate the demand with which the interest rates are manipulated by the same intermediaries, who do not pay the 'whole' to the Treasury." On July 3, 2017, Mexico's Comisión Nacional Bancaria y de Valores ("CNBV") announced it was conducting an investigation into Defendants' activities, and the MFN started its own separate investigation in June of 2017.

78.     Plaintiff was directly harmed by Defendants' collusion to fix the bid-ask spread. Plaintiff paid supracompetitive prices every time it purchased MGB from Defendants, and each time it sold the price was artificially suppressed by Defendants' conduct.

## VIII. DEFENDANTS' HISTORY OF FIXING FINANCIAL INSTRUMENTS

79.     Colluding with their competitors concerning terms of sale for financial instruments is not new to Defendants. Many of the named Defendants participated in previous market manipulation concerning LIBOR, Euribor, Foreign Exchange (FX), SSA Bonds, and the International Swaps and Derivatives Association fixed interest rate ("ISDAfix").

21

80.     The Deutsche Bank Defendants paid a total of $2.519 billion in criminal penalties and fines to regulators in connection with the LIBOR investigation, which concerned a conspiracy to fix the LIBOR, a key benchmark used in financial transactions. According to the U.S. Department of Justice the Deutsche Bank Defendants were the target of overlapping investigations: "Together with approximately $1.744 billion in regulatory penalties and disgorgement—$800 million as a result of a Commodity Futures Trading Commission (CFTC) action, $600 million as a result of a New York Department of Financial Services (DFS) action, and $344 million as a result of a U.K. Financial Conduct Authority (FCA) action—the Justice Department's criminal penalties bring the total amount of penalties to approximately $2.519 billion."

81.     According to the DOJ, "For years, employees at Deutsche Bank illegally manipulated interest rates around the globe—including LIBORs for U.S. Dollar, Yen, Swiss Franc and Pound Sterling, as well as EURIBOR—in the hopes of fraudulently moving the market to generate profits for their traders at the expense of the bank's counterparties. . . . [This] criminal resolution represents the largest penalty to date in the LIBOR investigation."

82.     The DOJ announced that the Barclays Defendants, JPMC Defendants, and Deutsche Bank Defendants pleaded guilty to participating in a price-fixing scheme that included manipulating the bid ask spread in foreign exchange ("FX") transactions. The Barclays, JPMC, and Deutsche Bank Defendants "agreed to plead guilty to conspiring to manipulate the price of U.S. dollars and euros exchanged in the foreign currency exchange (FX) spot market and the banks have agreed to pay criminal fines totaling more than $2.5 billion."

83.     According to the plea agreements in the FX guilty pleas "between December 2007 and January 2013, euro-dollar traders at Citicorp, JPMorgan, Barclays and RBS—self-described

members of 'The Cartel'—used an exclusive electronic chat room and coded language to manipulate benchmark exchange rates. Those rates are set through, among other ways, two major daily 'fixes,' the 1:15 p.m. European Central Bank fix and the 4:00 p.m. World Markets/Reuters fix. Third parties collect trading data at these times to calculate and publish a daily 'fix rate,' which in turn is used to price orders for many large customers. 'The Cartel' traders coordinated their trading of U.S. dollars and euros to manipulate the benchmark rates set at the 1:15 p.m. and 4:00 p.m. fixes in an effort to increase their profits."

84.    The Bank of America Defendants along with the Barclays Defendants, JPMC Defendants, and Deutsche Bank Defendants were fined $5.6 billion by the European Commission in connection with its investigation into the FX manipulation.

85.    The Barclays Defendants were also investigated for their role in manipulating the LIBOR. In June of 2012, Barclays Plc paid $453 million to United States and United Kingdom authorities in connection with the investigation.

86.    The Barclays Defendants agreed to pay the CFTC a $115 million fine in connection with its manipulation of the ISDAfix. "The CFTC Order requires Barclays to pay a $115 million civil monetary penalty, cease and desist from further violations as charged, and take specified remedial steps, including measures to detect and deter trading intended to manipulate swap rates such as USD ISDAFIX, to ensure the integrity and reliability of the Bank's benchmark submissions, and to improve related internal controls." According to the CFTC, the Barclays Defendants tipped the scales in their favor in ISDAfix transactions when it "bid, offered, and executed interest rate swap spread transactions in a manner deliberately designed—in timing,

price, and other respects—to influence the published USD ISDAFIX to benefit the Bank in its derivatives positions."[5]

87.    The Citigroup Defendants also agreed to pay a large fine to the CFTC in connection with its ISDAfix investigation. The Citigroup Defendants paid $425 million to settle the claims, which included evidence such as an email from a Citigroup trader that the ISDAFIX is "surprisingly easy to push! I think last week, I pushed it 3bps from 10:55 to 11:05 :)."[6]

88.    The DOJ has also been investigating price fixing activity, including fixing the bid-ask spread, in supranational, sub-sovereign and agency bond ("SSA") bonds. The Deutsche Bank Defendants, Bank of America Defendants, and Credit Suisse Defendants are at the center of that investigation. The investigation concerns allegations that traders coordinated price quotes to buyers and sellers of SSA bonds.

89.    The JPMC and HSBC defendants were fined 485.5 million euros by the European Commission for participating in a cartel concerning the pricing of interest rate derivatives denominated in euros ("Euribor"). On March 15, 2018 a trader employed by the Deutsche Bank Defendants pleaded guilty in England to his role in fixing the Euribor.[7]

## IX. EMPIRICAL EVIDENCE OF MANIPULATION

### A.    Price Dispersion in BONDES D Auctions Has Doubled.

90.    Price dispersion in auctions is an economic indicator of robust competition. "In the presence of widespread collusion we expect a decrease in the dispersion of winning bids and high

---

[5] *U.S. Commodity Futures Trading Commission*, Release Number 7180-15, https://www.cftc.gov/PressRoom/PressReleases/7180-15

[6] *The Salt Lake Tribune*, "Regulators find Citigroup bank rigged ISDAfix," May, 26, 2016, http://archive.sltrib.com/article.php?id=3933912&itype=CMSID

[7] *SFO*, "Ex-Deutsche Bank trader pleads guilty over EURIBOR manipulation," Mar. 15, 2018, https://www.sfo.gov.uk/2018/03/15/ex-deutsche-bank-trader-pleads-guilty-over-euribor-manipulation/

bidder expected profit."[8] As explained below, price dispersion in MGB auctions has increased significantly since COFECE announced its investigation.

91.    One way of measuring price dispersion in auctions is to analyze the range of winning bids in multi-price auctions such as BONDES D. BONDES D auctions are multi-price auctions, which means there can be more than one accepted price. They are also reportedly conducted as Dutch auctions, meaning that the auctioneer starts with a high price and lowers it if there are no bids. Banxico reports maximum bids (which are always accepted), and the minimum allocated bid. BONDES D auctions close at times with two prices, reflecting the best bids received.

92.    BONDES D auctions also have a feature that no other MGB has. According to Banxico, "Only Banco de México bondes D auctions use an 'interactive' system in which the marginal allocated price for the entire issuance is disclosed in real time, allowing bidders to improve their bids as long as the pre-established time for such purpose has not ran out." Given this interactive feature, it is not surprising that sometimes the maximum bid and the minimum allocated bid are the same. This is likely because some bidders determine to adjust their bid to meet the "marginal allocated price" necessary to be successful.

93.    Prior to April 19, 2017, the minimum and the maximum bids were routinely the same for BONDES D auctions, reflecting a statistically improbable outcome that strongly suggests bidders were colluding. For the Three Year BONDES D auctions, the minimum and maximum accepted bids were exactly the same number on 58% occasions in the fifty-five trading days before

---

[8] Bikhchandani, Sushil, Patrick L. Edsparr, and Chi-Fu Huang, "The Treasury bill auction and the when-issued market: Some evidence," UCLA working paper, 2000; see also Varian, Hal R., 1980, "A Model of Sales," American Economic Review 70, 651-659.

April 19, 2017. By comparison, after April 19, 2017 this phenomenon occurred only 23.6% of the time. As demonstrated in the chart below, the same pattern holds for the One Year and the Five Year BONDES D auctions:

| Occurrence of Identical Minimum and Maximum Winning Bids in BONDES D Auctions | | | |
|---|---|---|---|
| Time Period | One Year | Three Year | Five Year |
| April 19, 2007-May 10, 2018 | 50% (27 of 54) | 58% (32 of 55) | 56.4% (31 of 55) |
| April 20, 2017-May 10, 2018 | 22% (12 of 54) | 23.6% (13 of 55) | 25.4% (14 of 55) |

94.    These statistics suggest that bidding dispersion has increased significantly since COFECE announced its investigation. Across all issues of BONDES D that were auctioned before and after April 19, 2017 dispersion as measured by the non-occurrence of the maximum and minimum winning bids being the same has more than doubled. Data concerning the historic bid-ask spread in secondary markets for MGBs supports Plaintiff's allegations of anticompetitive conduct. After April 19, 2017, when COFECE announced its investigations, the bid-ask spreads for many issues of MGBs have dropped. This is consistent with the cessation of cartel activity.

**B.    Bid-Ask Spread In BONOS Narrows Since April 19, 2017**

95.    Similarly, the bid-ask spread in certain BONOS offerings that were traded in the open market narrowed significantly after April 19, 2017.

96.    A comparison of the trading in BONOS in the months before and after April 19, 2017 shows that for sixteen BONOS that were continuously traded from March 25, 2016 through May 11, 2018, the bid-ask spread narrowed, and the average difference as 23%.

| International Securities Identification Number (ISIN) | Issue Date | Maturity Date | % Difference (expressed as negative) |
|---|---|---|---|
| MX0MGO0000G1 | 2/12/2009 | 12/13/2018 | 37.13% |
| MX0MGO0000T4 | 8/30/2013 | 6/14/2018 | 63.97% |
| MX0MGO0000V0 | 11/7/2014 | 12/11/2019 | 46.54% |
| MX0MGO0000L1 | 2/25/2010 | 6/11/2020 | 46.81% |
| MX0MGO0000N7 | 2/3/2011 | 6/10/2021 | 42.66% |
| MX0MGO0000Q0 | 2/15/2012 | 6/9/2022 | 25.62% |
| MX0MGO000003 | 10/30/2003 | 12/7/2023 | 25.97% |
| MX0MGO000078 | 1/20/2005 | 12/5/2024 | 2.28% |
| MX0MGO0000Y4 | 10/16/2015 | 3/5/2026 | 0.10% |
| MX0MGO0000D8 | 1/18/2007 | 6/3/2027 | 9.00% |
| MX0MGO0000H9 | 1/15/2009 | 5/31/2029 | 17.97% |
| MX0MGO0000P2 | 9/9/2011 | 5/29/2031 | 18.63% |
| MX0MGO0000U2 | 4/11/2014 | 11/23/2034 | 3.64% |
| MX0MGO0000B2 | 10/26/2006 | 11/20/2036 | 11.32% |
| MX0MGO0000J5 | 1/29/2009 | 11/18/2038 | 14.52% |
| MX0MGO0000R8 | 4/20/2012 | 11/13/2042 | 16.55% |

97.    This measure of the bid-ask spread in BONOS is consistent with the existence of collusive activity prior to April 19, 2017, and shows that Defendants' anticompetitive activity was not limited to initial auction offerings.

## X.    FRAUDULENT CONCEALMENT

98.    Plaintiff and members of the Class could not have discovered, with reasonable diligence, the existence of the conspiracy until COFECE's investigation was made public in April of 2017.

99.    Defendants concealed the existence of the conspiracy from Plaintiff and members of the Class, and there is nothing in the public domain that would put Plaintiff or anyone else on notice that Defendants were conspiring at meetings regarding prices for Inductors sold in the United States.

100.    The discussions and exchange of information between Defendants were furtive. The nature of a price-fixing scheme requires secrecy.

27

**XI.    CLAIM FOR RELIEF**

**VIOLATION OF THE SHERMAN ACT**
**15 U.S.C. §§ 1 and 3**
**(Alleged against all Defendants)**

101.    Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

102.    Defendants violated Section 1 of the Sherman Act by conspiring to artificially restrict competition in the market for MGB. Starting January 1, 2006 Defendants repeatedly exchanged competitively sensitive information, including prices at which they would buy and sell MGB in auctions and in secondary markets. Defendants agreed to coordinate their bids to widen the bid-ask spread, thereby inflating the prices at which MGB were sold to investors, and suppressing the prices at which Defendants would purchase MGB.

103.    Defendants formed a cartel, organized around their status as Market Makers in various MGBs.

104.    As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their conspiracy, prices for MGB sold to investors in the United States during the Class Period were raised, fixed, maintained, or stabilized at artificially inflated levels, and prices of MGBs bought by Defendants were suppressed.

105.    The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

106.    Defendants' anticompetitive and unlawful conduct is illegal per se.

107.    On information and belief, a substantial amount of sales of MGB were made to United States territories and the District of Columbia for purposes of Section 3 of the Sherman Act.

## XII. DEMAND FOR JUDGMENT

108.    Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Direct Purchaser Class that:

A.    This action may proceed as a class action, with Plaintiff serving as a Class Representative under Fed. R. Civ. P. 23(c);

B.    Defendants have violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiff and the Direct Purchaser Class have been injured in their business and property as a result of Defendants' violations;

C.    Plaintiff and the Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15;

D.    Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

E.    Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' restraint of trade, including issuing a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from repeating (or continuing and maintaining) the conspiracy or agreements alleged herein;

29

F.  Defendants are to be jointly and severally responsible financially for all costs, including the expenses of a Court-approved notice program;

G.  Plaintiff and the Class recover their reasonable attorneys' fees as provided by law; and

H.  Plaintiff and the Class receive such other or further relief as may be just and proper.

## XIII.  JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(c), Plaintiffs demand a trial by jury on all matters so triable.

Dated: May 25, 2018                          Respectfully submitted,


                                            By:/s/ Michael A. Toomey
                                            BARRACK, RODOS & BACINE
                                            William J. Ban
                                            Michael A. Toomey
                                            11 Times Square
                                            640 8th Avenue, 10th Floor
                                            New York, NY 10022
                                            Telephone: (212) 688-0782

                                                   and

                                            BARRACK, RODOS & BACINE
                                            Jeffrey A. Barrack
                                            3300 Two Commerce Square
                                            2001 Market Street, Suite 3300
                                            Philadelphia, PA 19103
                                            Telephone: (215) 963-0600

                                            *Attorneys for Plaintiff Government Employees' Retirement System of the Virgin Islands*

30

***Of Counsel****:*

BARRACK, RODOS & BACINE
Gerald J. Rodos
Jeffrey B. Gittleman
3300 Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA 19103
Telephone: (215) 963-0600

31